UNITED STATES DISTRICT COURT
For the
Southern District of Texas
Houston Division

| | | |
|---|---|---|
| Ulla Britt Larka, DPM, FACFAS, § | | Case No. _____ |
| § | | |
| Plaintiff § | | |
| § | | |
| vs. § | | Jury Trial Requested |
| § | | |
| Spring Branch Podiatry, PLLC, § | | |
| § | | |
| Defendant. § | | |

## COMPLAINT

Plaintiff Dr. Ulla Britt Larka, licensed Doctor of Podiatric Medicine, files this complaint because her former employer, defendant Spring Branch Podiatry, PLLC, failed to reasonably accommodate her disabilities of dyslexia and ADHD and then terminated her in violation of the Americans with Disabilities Act and the Age Discrimination in Employment Act.

### I.   Parties

1. Plaintiff Dr. Ulla Britt Larka ("Dr. Larka"), licensed Doctor of Podiatric Medicine, is an individual domiciled in Houston, Texas.

2. Defendant Spring Branch Podiatry, PLLC is a Texas limited liability company which may be served with process through its registered agent, Dr. Randall Beckman, 9055 Katy Freeway, Suite 460, Houston, Texas, 77024.

### II.   Jurisdiction and Venue

3. This action is brought pursuant to the Americans with Disabilities Act of 1990, as codified, 42 U.S.C. §§ 12112 to 12117. Dr. Larka timely filed her Charge of

1

Discrimination and has received her Notice of Right to Sue from the Equal Employment Opportunity Commission. The Charge is attached as Exhibit 1. The Notice of Right to Sue is attached as Exhibit 2. Dr. Larka files this Complaint within the 90-day period.

4. This action is also brought pursuant to the Age Discrimination in Employment Act of 1967, as codified, 29 U.S.C. §§ 621 to 634.

5. Venue is proper in this District because all parties reside within the District and because the acts and omissions upon which the claims are based occurred within the venue of this court's jurisdiction.

6. Dr. Larka seeks monetary damages in excess of $75,000.

### III. Key Facts

7. Dr. Larka is a licensed podiatrist who is Board Certified in Foot Surgery.

8. Dr. Larka has been a licensed podiatrist in good standing since 2001.

9. From 2001 to 2018, Dr. Larka had her own practice.

10. Dr. Randall Beckman encouraged Dr. Larka to join his practice, Spring Branch Podiatry, PLLC.

11. During the recruitment process, Dr. Beckman expressed his respect for Dr. Larka's skills.

12. As part of his efforts to recruit Dr. Larka to join Spring Branch Podiatry, Dr. Beckman made a number of promises on behalf of Spring Branch Podiatry.

13. One of the promises was that Spring Branch Podiatry would provide Dr. Larka with a medical scribe.

14. The promise of a medical scribe was a material inducement for Dr. Larka to join Spring Branch Podiatry.

15. Dr. Larka has long been diagnosed with dyslexia and ADHD, disabilities as to which Dr. Beckman had personal knowledge.

16. A medical scribe is necessary for Dr. Larka to keep up with seeing patients both in the office and in the hospital and keep up with documentation required by insurance companies for payment.

17. Dr. Larka is an extremely productive and skilled podiatrist, but without a medical scribe she struggles to keep up with the documentation required by insurance companies.

18. Spring Branch Podiatry understood and accepted that Dr. Larka has dyslexia and ADHD and that a medical scribe was a reasonable and necessary accommodation for her.

19. Spring Branch Podiatry did in fact provide Dr. Larka with a part-time medical scribe for two days and another part-time scribe for a few months. In both cases, the scribe was made available only for in-office patients, not for her work in the hospital. In other words, Spring Branch Podiatry did not provide Dr. Larka a medical scribe for the vast majority of Dr. Larka's work.

20. After the first several months, Dr. Beckman determined that Dr. Larka could be more productive with a full-time medical scribe.

21. Dr. Larka was provided a full-time medical scribe for only two days.

22. After that. Spring Branch Podiatry told Dr. Larka that, in place of the medical scribe, she could use a computer located at the practice which had dictation software loaded on it.

23. In fact, Spring Branch Podiatry never provided Dr. Larka a computer with dictation software loaded on it.

24. Instead, Spring Branch Podiatry told Dr. Larka she could use the computer with dictation software that was located in the center of the back office.

25. This was not a reasonable accommodation for several reasons. First, much of Dr. Larka's work involved visiting patients in the hospital where the volume of Dr. Larka's in-patient visits required contemporaneous access to the billing system which was available only at the office. Second, the in-office computer with dictation software was generally not accessible to Dr. Larka because it was Dr. Beckman's work station. Predictably, Dr. Larka fell behind in her documentation, in spite of putting in very long working hours.

26. Another false and material representation Spring Branch Podiatry made to Dr. Larka was that she would be paid commensurate with her experience and patient volume. According to the Bureau of Labor Statistics, the annual mean wage for all podiatrists in the greater Houston area is the annual salary of $190,670. Spring Branch Podiatry paid Dr. Larka an annual salary of $100,000 despite the fact that Dr. Larka is more experienced than the average podiatrist. Dr. Larka generated more than $1 million in billings each year she was with Spring Branch Podiatry.

27. Spring Branch Podiatry created a system by which it benefited from Dr. Larka's productivity and willingness to visit patients in the hospital, and then refused to pay her based on the predictable consequences of removing the reasonable accommodation of a medical scribe.

28. Spring Branch Podiatry's violations of the Americans with Disabilities Act, both its failure to provide reasonable accommodation and its subsequent termination of employment, resulted in economic damages to Dr. Larka of at least $200,000.

29. Spring Branch Podiatry also discriminated against Dr. Larka based on her age, 51 at the time of her termination.

30. Dr. Larka brought with her to Spring Branch Podiatry nearly two decades of patient relationships she had developed when she had her own practice.

31. Dr. Larka, at Spring Branch Podiatry's request, also brought with her the phone and fax numbers as well as the referral relationships Dr. Larka had developed over nearly two decades.

32. Spring Branch Podiatry promised Dr. Larka that she would be able to treat her existing patients and grow her practice using the Spring Branch Podiatry platform.

33. Spring Branch Podiatry did not fulfill its promises to Dr. Larka. Instead, it directed new patient referrals to a younger podiatrist, Dr. Chandana Halaharvi, who was under the age of 30. Spring Branch Podiatry's decision to send referrals to this young podiatrist instead of Dr. Larka caused Dr. Larka financial harm.

34. Spring Branch Podiatry further demonstrated its age discrimination by causing Dr. Larka's patients to wait an hour or more for their appointments. Spring Branch Podiatry preferentially made treatment rooms and nursing staff available to its younger podiatrists at the expense of Dr. Larka.

35. Another way in which Spring Branch Podiatry discriminated against Dr. Larka based on her age was by failing to provide adequate staffing which meant cancellation of Dr. Larka's patient's appointments. Appointments were not canceled for Dr. Halaharvi, only Dr. Larka.

36. In June 2019, Dr. Larka asked for one week off to care for her critically ill mother in New York. The day she was set to leave, July 1, 2019, Spring Branch Podiatry provided her a 60-day notice of termination.

37. Spring Branch Podiatry's termination letter, signed by Dr. Beckman, gave no legitimate, nondiscriminatory reason for termination. Instead, it said "I expect you to continue your pursuit in excellent patient care, which you already do, and continue to work with my staff in the utmost professional manner. I also pledge to do our best in continuing to schedule your patients without interruption or confusion during this time."

38. Verbally, Dr. Beckman made clear his discriminatory animus. He told Dr. Larka, "I want you gone, you're an old dog."

39. When Dr. Larka first joined Spring Branch Podiatry, she brought with her equipment from her practice including an x-ray machine she had purchased for more than $49,000, as well as a patient chair and other valuable equipment. Spring Branch Podiatry failed to pay Dr. Larka for the usage of these items and, in some cases, failed to return them to her after her employment ended.

40. Stored on the x-ray machine purchased by Dr. Larka were approximately ten years of patient x-rays that provided crucial treatment information. Dr. Larka has never been provided those patient records even though they are lawfully her property. TEXAS ADMINISTRATIVE CODE, Title 16, Chapter 130, Rule 130.54(b).

41. Spring Branch Podiatry has not returned to Dr. Larka the phone and fax numbers she had been using in her practice before she joined Spring Branch Podiatry.

42. Rubi Moya, Practice Manager for Spring Branch Podiatry, functioned as Dr. Larka's manager with respect to billing, insurance, and the other business aspects of medical practice. Ms. Moya, in her role as Practice Manager for Spring Branch Podiatry, repeatedly showed animus towards Dr. Larka based on her age and her need for accommodation based on her disabilities. Ms. Moya engaged in a campaign of unlawful harassment of Dr. Larka which affected many aspects of Dr. Larka's employment, and

ultimately resulted in Dr. Larka's termination. Ms. Moya created a hostile and abusive work environment for Dr. Larka in violation of the ADA and ADEA.

43. Alternatively, if Ms. Moya is determined by the trier of fact not to be Dr. Larka's manager, she was a coworker. Dr. Larka complained to Dr. Beckman repeatedly about Ms. Moya's hostile and harassing behavior and adverse employment actions. Dr. Beckman took no action other than to terminate Dr. Larka.

44. Spring Branch Podiatry's failure to take any action in response to Dr. Larka's complaints resulted in a pattern of harassment against Dr. Larka. This was conducted by Ms. Moya with the knowledge and consent of Dr. Beckman.

## IV.   Causes of Action

### A.   Disability Discrimination

45. Dr. Larka repeats and realleges paragraphs 1 through 41 as if fully set forth herein.

46. Dr. Larka has dealt with the conditions of dyslexia and ADHD. She personally informed Dr. Randall Beckman, Rubi Moya, and Spring Branch Podiatry of these disabilities before she joined the practice.

47. Because of her dyslexia and ADHD, Dr. Larka is a "qualified individual with a disability" within the meaning of 42 U.S.C. § 12111 of the ADA.

48. Dr. Larka could perform the essential functions of her position with the reasonable accommodation of a medical scribe.

49. Spring Branch Podiatry initially accommodated Dr. Larka's disability, but subsequently stopped, approximately six months into their employment relationship.

50. Dr. Larka repeatedly notified Spring Branch Podiatry of her need for a medical scribe.

51. Spring Branch Podiatry refused to engage in the interactive process and denied Dr. Larka's request, claiming that periodic access to a computer with dictation software was a sufficient accommodation. It was not, for the reasons stated above.

52. When Dr. Larka began struggling to keep up with the documentation requirements of her position after Spring Branch Podiatry ceased providing a medical scribe, Spring Branch Podiatry began harassing Dr. Larka about the predictable consequences of removing the reasonable accommodation.

53. Dr. Larka suffered damages as a result of Spring Branch Podiatry's unlawful discriminatory actions, including past and future lost wages and benefits, emotional distress, and the costs of bringing this action.

54. Spring Branch Podiatry and its agents Dr. Beckman and Ms. Moya intentionally violated Dr. Larka's rights under the ADA with malice or reckless indifference and, as a result, are liable for punitive damages.

**B.   Age Discrimination**

55. Dr. Larka repeats and realleges paragraphs 1 through 51 as if fully set forth herein.

56. Dr. Larka was 51 years old and qualified for her position when Spring Branch Podiatry terminated her.

57. Dr. Beckman told Dr. Larka, "I want you gone, you're an old dog."

58. In addition, Spring Branch Podiatry marginalized Dr. Larka while treating a younger, similarly-situated podiatrist more favorably. Specifically, Spring Branch Podiatry assigned new patients to a younger podiatrist, made Dr. Larka's patients wait longer for appointments, systematically under-resourced Dr. Larka, and Dr. Larka's

patients' appointments were canceled in favor of the younger podiatrist' patient appointments.

59. Dr. Larka was replaced by Dr. Chandana Halaharvi, who is significantly younger than Dr. Larka. Dr. Halaharvi was hired after Dr. Larka.

60. Dr. Larka suffered damages because of Spring Branch Podiatry's unlawful discriminatory actions, including past and future lost wages and benefits and the costs of bringing this action.

61. Spring Branch Podiatry and its agents Dr. Beckman and Rubi Moya willfully violated Dr. Larka's rights under the ADEA and, as a result, are liable for liquidated damages.

**C.    Quantum Meruit**

62. Dr. Larka repeats and realleges paragraphs 1 through 58 as if fully set forth herein.

63. Dr. Larka provided valuable services and materials to Spring Branch Podiatry.

64. Spring Branch Podiatry accepted both the services and the materials provided by Dr. Larka.

65. Spring Branch Podiatry had reasonable notice that Dr. Larka expected compensation for both her services and materials.

66. Spring Branch Podiatry failed to pay Dr. Larka for the valuable services and materials she provided.

**D.    Fraud, Fraud by Nondisclosure, and Promissory Estoppel**

67. Dr. Larka repeats and realleges paragraphs 1 through 63 as if fully set forth herein.

9

68. Spring Branch Podiatry, through its agent Dr. Beckman, induced Dr. Larka to join Spring Branch Podiatry by making false promises, upon which Dr. Larka relied to her detriment.

69. Spring Branch Podiatry promised Dr. Larka she could practice podiatry and grow her practice, that it would support her in her work, and that she would be compensated accordingly. These promises were false.

70. Spring Branch Podiatry, through its agent Dr. Beckman, knew these promises were false when made or, alternatively, made the representations recklessly, as a positive assertion, and without knowledge of their truth.

71. Dr. Larka would not have joined Spring Branch Podiatry had she known it intended to divert her patients, hobble her ability to service her patients, pay her less than she was worth, and use her skills, relationships, and assets to the benefit of Spring Branch Podiatry and to her detriment.

72. Dr. Larka has been damaged as a result of Spring Branch Podiatry's actions in at least the amount of $200,000.

## V.   Relief Requested

73. Plaintiff Dr. Ulla Britt Larka respectfully requests judgment as follows:

    A.   Award to plaintiff of her past and future loss of wages and benefits, plus interest;

    B.   Reinstatement of plaintiff to a position comparable to her former position or, in lieu of reinstatement, award her front pay (including benefits);

    C.   Award to plaintiff of liquidated damages incurred in connection with this action;

D.  Award to plaintiff of all costs and reasonable attorneys' fees incurred in connection with this action; and

E.  Grant to plaintiff such additional or alternative relief as the Court deems just and proper.

        Respectfully Submitted,

         s/Katherine T. Mize
        Katherine T. Mize, Attorney-in-Charge
        Texas Bar No. 00784617
        Southern District of Texas No. 15523
        717 Texas, Suite 1200
        Houston, Texas 77002
        Tel.: 713-595-9675
        Fax: 713-595-9670
        Email: katherine.mize@mizepc.com

Of Counsel:

Mize PC
717 Texas, Suite 1200
Houston, Texas 77002
Tel.: 713-595-9675
Fax: 713-595-9670